69 So.2d 147 (1953)
MOUTON
v.
GULF STATES UTILITIES CO.
No. 3762.
Court of Appeal of Louisiana, First Circuit.
December 18, 1953.
J. Minos Simon, Lafayette, for appellant.
Porter & Stewart, Lake Charles, Bailey & Mouton, Lafayette, for appellee.
LOTTINGER, Judge.
This is a suit under the Employers' Liability Act of Louisiana, LSA-R.S. 23:1 et seq., for maximum compensation, plus interest, penalty and attorney fees. The claim for penalty and attorney fees has been abandoned since this action was instituted. After trial on the issues below, the lower court rendered judgment for defendant and dismissed petitioner's action. The petitioner has taken an appeal.
Petitioner claims that as a result of certain alleged accidents occurring during the course and scope of his employment with defendant, he is suffering from traumatic neurosis, which, he says, permanently and totally disables him from performing the work for which he was employed. Petitioner does not claim to have sustained any *148 physical injury whatsoever in this case. He does not allege that the accidents in question caused any injury to the physical structure of his body. His claim is that, as a result of certain alleged occurrences, he has become nervous and unstable, and is unable to continue in his job with the defendant.
The facts show that petitioner was employed as a helper by defendant on July 19, 1948, and served in that capacity until July 10, 1949, when he was promoted to apprentice lineman. He served as apprentice lineman until July 9, 1950, when he was promoted to 4th class lineman. On July 9, 1951, he was promoted to 3rd class lineman, which position he held until his discharge on April 24, 1952. According to petitioner's testimony, he did not work with electric wires at all as a helper, and during the first six months as an apprentice lineman, he worked only with dead wires. During his last six months as an apprentice and during his services as a 4th class and 3rd class lineman, petitioner climbed poles and worked with live wires.
The accidents on which petitioner relies for a cause of action are (1) an explosion of a fuse near him during the early days of 1951, and of an electric shock from a 110-volt wire on August 21, 1951. The exact date of the fuse explosion is not set out in the record, but it happened during the severe freeze during the week beginning on January 28 and ending February 3, 1951.
The incident of the fuse explosion occurred while the crew, with which petitioner worked, was on a job to repair difficulties in the electric lines at Grand Coteau, Louisiana. They checked the line and, finding nothing wrong, petitioner climbed a pole and placed a fuse in the fuse socket. Petitioner claims that after a few seconds the fuse exploded when his face was approximately 12 to 18 inches from it, and that the explosion caused him to become temporarily paralyzed with fear. Petitioner and his crew continued working to find the difficulty, and completed their work day.
Later, on August 21, 1951, petitioner claims that, while discharging his duties with defendant company, he came into contact with a live wire carrying an electrical current of 110 volts, as a result of which he was severely shocked to such an extent as to disable him from performing any further services during that particular day. He contends, that as a result of these two instances, his nervous system has been completely upset, and he has become high-strung, and, furthermore, he has developed an uncontrollable fear of climbing poles, and a feeling of uncertainty and insecurity while working around electrical wires or at the top of electrical poles.
Defendant filed an exception of prescription in the matter, which was referred to the merits. It then filed answer which amounts to a general denial.
After trial, the lower court, for written reasons, rendered judgment for defendant, and dismissed petitioner's suit. Petitioner took this appeal.
As to the fuse incident, the record shows that petitioner was not "scared stiff", as he contends, when the fuse exploded. He testified that "after I realized what had happened, I knew there wasn't any harm". The petitioner further admitted in his testimony that after the fuse had exploded, he and the other members of his crew searched the line for a distance of some five or six city blocks in an attempt to locate the trouble. There was no physical injury to petitioner whatsoever as a result of the alleged explosion. He continued working for several days, until March 12, 1951, when he took sick leave from his company. Witness LeRoy Boutin, who was working with petitioner at the time of the alleged explosion, testified that he did not notice anything unusual about petitioner's conduct when he came down from the pole after the fuse blew. He did not remember of petitioner having complained, and testified that petitioner continued to do his normal work. Several witnesses testified that a fuse explosion is a rather ordinary event in the work of a lineman. They established that the further the distance of the short circuit from the fuse, the less noise is made by the explosion; *149 and the greater distance the trouble, the longer will be the delay before the fuse explodes. In the case before us the trouble was some five or six city blocks from the fuse. The fuse in question was of only ten amperes, which is a small one. Witness Airhart, who is a first-class lineman, testified that a ten-amp fuse makes a little noise, a little louder than a cap pistol.
It was further shown, that at the time of the alleged explosion, petitioner was using a hot stick. Such is an instrument used in placing the fuse into the socket. A hot stick varies in length depending on the numbers of sections used. Each section is from three to four feet in length. Petitioner, according to the evidence was using at least one section and possibly two. It therefore, becomes evident that the petitioner must have been some six or seven feet from the fuse when it exploded, and could not have been only 12 to 18 inches as he claims. Supposing that he was only using one section, which would be about four feet in length. To that we would expect to add about three feet, which would be an approximate arm's length.
It appears that the explosion of a fuse would be a minor incident in the life of a lineman. If a person were tempermentally and physically fit to become a lineman, we doubt that such a minor incident could cause him such shock as to render him totally and mentally unable to perform his duties, or any duties of a reasonable nature. It appears that, if the opposite were so, the petitioner would have been in such a nervous and shocked condition as to render him unable to complete his day's work. Here, he not only completed his day's work, but worked several weeks before he took sick leave. As a matter of fact, so minor did petitioner consider the fuse explosion at the time, that he did not make an accident report thereon; and it was a firm rule of the defendant company that all accidents were to be reported. Petitioner did not even report the incident, nor complain, to his foreman Mr. Sudduth or to Mr. Boutin, his fellow worker.
As to the electrical shock, the petitioner testified that he was on a pole doing some work in moving a metal rack. He was holding the metal rack with his left hand, when another part of his left hand, or arm, touched a neutral wire. As the metal rack was energized with electricity, the touching of the neutral caused the electricity to go from the metal rack through his hand to the neutral. The voltage in this instance was of 110 volts. Although petitioner claims that he received a severe shock all the way to his ankles, other witnesses testified that such could not be the case as the electricity would merely run through his hand, or arm, from the metal rack to the neutral wire. Petitioner did hand in a written report of this accident. His statement as contained in said report, which was introduced into evidence, is as follows:
"I was driving a hard head through the through bolt hole of a secondary rack, which was hot. And I didn't know it. The hard head was in my left hand. Then my left hand touch the neutral wire. Received shock, which made one nervous and weak."
Witness, Daigle, who was on the pole with petitioner at the time of the alleged shock, testified that petitioner told him that he received a slight shock. Witness Desormeaux testified that he heard petitioner ask his foreman for permission to come down from the pole, but that said request was in a conversational tone. The witnesses did testify that petitioner appeared nervous after the shock, and he was allowed to lay off the remainder of the day.
The record shows that petitioner returned to work the day following the alleged shock, and continued to work full hours for the remainder of the week. The record shows that he worked, without interruption, until his discharge in April, 1952.
Mr. Rauschenberg, the manager of defendant company, testified that he spoke with petitioner about the alleged shock shortly after it happened, and that he was not convinced that there was an accident. He stated that he wanted to determine if *150 petitioner had had a shock and asked him if he was sure he had been shocked, to which petitioner replied: "I don't know, I must have felt something". This same witness testified that in the old days the linemen would test a circuit, or 110-volt wire, with their hand. His testimony, on this score, is as follows:
"Q. Have you had any experience in your days as a lineman with the testing of a circuit or 110 volt wire? A. Yes, sir, we used all methods; we have the most modern now. We use volt meters.
"Q. Was it ever the practice to test it with your own hand? A. Yes, the old lineman; we did. We didn't even carry a test light.
"Q. How did you do that? A. By grounding our thumb or finger and reaching a hot wire.
"Q. In other words if you had a neutral wire and a secondary wire carrying 110 volts you have seen that sort of situation tested by touching the secondary wire with the finger and the neutral wire with the thumb? A. Yes, in order to see if the fuse was blown.
"Q. Have you ever got a shock that way? A. You get it at the point of contact."
As a result of the two alleged accidents, the petitioner contends that he has developed a serious nervousness, a great fear of his work and a feeling of insecurity, and that he suffers from headaches, weakness, numbness, nausea and other general complaints, to such extent that he can no longer work. He further contends that he has lost weight from 185 to 172, or 177 pounds.
Mr. Rauschenberg testified that petitioner began having his so-called sick spells about the middle of 1949, long before the first alleged accident. The record discloses that he was off from work for about five days in October, 1950, when he complained of a cold. Dr. Montgomery testified that he saw petitioner in the early part of 1951 and found him to be in a nervous condition. This was shortly after petitioner's baby was born.
The record shows that petitioner worked with two superiors, first with Mr. Suddeth and then with Mr. Compton. He was transferred to Mr. Compton's crew about two months before he is alleged to have received the electric shock on August 21, 1951. While he was with Suddeth, the latter says he complained of illness on the way to work, but he didn't know whether it was in 1950 or 1951. Witness Airhart testified to two specific instances when petitioner complained of illness due to weakness and nervousness while in the Suddeth crew. The witness said that on the first occasion petitioner and his crew were returning from Henderson where they had gone to pick up some material, and petitioner complained of weakness and nervousness and was taken to a doctor. The second occasion was about a month or a month and a half after the Henderson incident. Petitioner, according to Airhart, had a similar complaint on his way to a job near Duson, and he was taken back to Lafayette before doing any work. The witness, Rauschenberg, who talked with petitioner about that occasion, confirmed the latter incident and said it was about March, 1951.
The record shows no specific instances of complaint, or time lost, after the alleged shock of August, 1951, until April, 1952, when the incident occurred which coupled with petitioner's past history, led to his discharge. On that occasion, petitioner was working on a job on the Opelousas line, and he complained of his same condition of weakness and nervousness, and he asked for a leave of absence. He left the job and did not return the next day, but did come back the day following. A few days later he went with Mr. Rauschenberg to see Dr. Voorhies, who recommended a change of employment, and, acting on that recommendation, petitioner was discharged.
*151 Dr. Voorhies examined petitioner in April, 1952, and testified that he could not make a final diagnosis of petitioner's condition. He said, however, that he could tell there was nothing organically wrong with petitioner and that his complaints were of a nervous nature. The doctor testified that this condition of nervousness could result from natural causes. He was of the opinion that petitioner was afraid of his work, and thought that if the cause were removed, he would probably improve. Dr. Voorhies stated that any final diagnosis in a case of this sort would have to come from a psychiatrist.
In August of 1952, shortly prior to trial of the case, petitioner consulted Dr. A. T. Butterworth, an eminent psychiatrist of the City of New Orleans, for the purpose of qualifying him to testify on petitioner's behalf. His depositions were taken, and introduced into evidence, over objection by defendant. Dr. Butterworth testified that his examination was based on a question and answer interview with petitioner and his wife, and he stated that the incident of the fuse explosion, as given to him by petitioner, was as follows:
"In March of 1951, the patient sustained a frightening and apparently traumatic experience when a fuse exploded while he was working at some height. Immediately following this, the patient `blacked out' and it was necessary to remove him from the pole and to return him home in an ambulance. He complained at this time of extreme weakness, nervousness `numbness' of the ulnar side of the forearms and the back of the neck. * * *"
The record does not disclose, in the least bit, that the alleged fuse explosion was of such a nature as related to Dr. Butterworth by petitioner. Aside from any objection by defendant to the testimony of Dr. Butterworth, we believe that the story of the incidents given him by petitioner were exaggerated to such an absurd extent as to render the value of Dr. Butterworth's testimony absolutely nil. Dr. Butterworth's testimony was based exclusively on two question and answer periods of about 45 minutes duration each, held in his office. His findings were based on the incidents as related to him by petitioner.
The record discloses that only seventeen days after petitioner commenced working for defendant company, on July 26, 1949, a fellow worker, Charles Breaux, was electrocuted while working with the petitioner. Petitioner was present and saw the accident. Defendant contends that this incident could well have been the one which caused the symptoms of which petitioner now complains, particularly in view of the fact that petitioner was absent from work due to certain illnesses, and complained of nervousness, before the incident of the fuse explosion.
In a complete and well-reasoned opinion, the lower court, stated as follows:
"It is the established rule in this State that proof by plaintiff that a given accident could have caused his condition is not sufficient nor does it satisfy the requirements of proof that the evidence shows such condition probably resulted from the accident. The proof must be certain; possibilities and even probabilities are not enough.
"In Majors v. Louisiana Central Oak Flooring Corporation, La.App., 16 So.2d 491, the Court had this to say on that subject: `It is too well established to necessitate citation of authority that plaintiff must make out his case beyond a mere possibility or probability of a casual connection of aggravation of disabling injuries.'
"Brent v. Union Indemnity Co., 17 La.App. 689, 135 So. 735, announced the rule in these words: `In the present case, causation is not proved with reasonable certainty, but, on the contrary, the preponderance of the testimony, as we have already pointed out, is to the effect that the accident or trauma was a possible, but not the *152 probable cause of the disability, and as we have seen, the Louisiana Supreme Court has indicated that even evidence of probable causation would be insufficient to sustain the burden of proof required of a plaintiff in cases of this character.'"
We do not believe that petitioner, Mouton, has proved with legal certainty that he sustained an accident as he claims, or if he did sustain such an accident, that it caused his present disability. There is evidence in the record that the petitioner suffered with these nervous spells prior to the alleged fuse explosion in the early part of January, 1951. After the alleged explosion of the fuse, the petitioner continued working for a considerable period of time before he suffered his next sick spell. The evidence further shows that if petitioner did receive an electrical shock, as alleged, such shock was minor and was usual to his trade. Although he did ask, and was permitted, not to continue working that day, the evidence shows that he did return to work the following day and continued working for some time before he was again stricken with a nervous spell, as a result of which he was discharged from employment with defendant company.
In Stanford v. Long & Wolfe, La.App., 199 So. 608, 609 the injury occurred while the petitioner was working as a roughneck on an oil derrick. As a result of an accident, petitioner suffered an injury to his foot, to which an operation was performed, and the petitioner, evidently, fully recovered from said injury. In that case, this court, speaking through the late Judge Dore, said:
"We note that Dr. Tisdale had plaintiff under observation longer than any of the other physicians, and that he testified as a witness called by the plaintiff himself. His testimony is to the effect that the operation performed by him was entirely satisfactory and that the plaintiff should be capable of performing his former duties except for subjective symptoms. The subjective symptoms, of course, are the statements of the plaintiff himself which relate to the pain in his foot and which he says makes him afraid to put his weight on it. The preponderance of all the medical testimony, including that of Dr. Tisdale, is that there are no objective signs or symptoms to indicate that plaintiff cannot use his foot in the usual and normal condition that any person would and our impression of the conclusion reached on that point is that he does not so use it because he wills not to do so. Some of the doctors state that he may experience some sort of fear of pain which apparently they cannot account for. Whilst the compensation law will permit an injured employee to recover for an injury which produced traumatic hysteria, as was held by this court in the case of Vaughn v. Solvay Process Co., [La.App.] 176 So. 241, the evidence should be more convincing than it is in this case; that there should be a sound cause and good reason for the mental condition which superinduces a fear of pain in the individual strong enough to render him totally disabled. No such cause or reason is shown to exist in this case. It is to be noted, moreover, that in the Vaughn Case, the disability was not based entirely on the condition of hysteria, but we were of the opinion also that the preponderance of the evidence justified the conclusion that the injured employee had a sufficient injury and abnormality of the bones in his wrist to impair its movement and to cause pain when movement was attempted."
It is our opinion that the petitioner has failed to prove his case by a preponderance of the evidence, as was held below. Furthermore, the lower court was personally faced by the petitioner and the witnesses to both sides to the controversy. It considered the demeanor of the witnesses, their appearance and response to questions asked of them. Upon weighing the mass of *153 testimony in the record, the court below held for defendant. We are certainly unable to find any manifest error, which would justify a reversal.
For the reasons hereinabove assigned, the judgment of the lower court will be affirmed.
Judgment affirmed.