REID, Judge.
Plaintiff, Walter Davenport, prosecutes this appeal from a judgment dismissing his suit to recover workmen’s compensation benefits against defendant, Kaiser Aluminum and Chemical Corporation. Plaintiff alleges he is totally and permanently disabled as a result of having sustained an injury to his back which caused the aggravation of a pre-existing back ailment, following an accident which occurred on May 16, 1960, while he was performing his duties as a common laborer in the course and scope of his employment with Defendant Corporation. Defendant denies plaintiff has sustained disabling injuries and alternatively pleads, if plaintiff suffers from any disability, such was not incurred due to his employment with defendant.
Plaintiff testified that on the date of the accident he bent over to turn off a pump and in raising up hit his back on an H beam. No one witnessed the accident. Plaintiff was first treated at defendant’s infirmary by Mrs. Marlene Zuccaro, a registered nurse, who testified at the trial she observed a contusion and minor abrasions on plaintiff’s back and treated the injury with a dressing and an ice pack. She then referred plaintiff to Dr. McVea, who testified he examined plaintiff on May 17, 1960.
The record discloses that the plaintiff’s employment was terminated as a part of a reduction in the work force at the defendant’s plant, effective on the 30th of May. However, the record is not clear as to whether or not the plaintiff knew of his impending termination prior to his accident on May 16 or not. This fact is alleged by the defendant in its answer but is not clearly brought out by the record itself.
*835 After trial on the merits the Trial Court rendered a judgment on November 3, 1961 in favor of the defendant, Kaiser Aluminum & Chemical Corporation and against the plaintiff, Walter Davenport, dismissing plaintiff’s suit at his costs. The Trial Judge did not render written reasons.
For the purpose of this appeal the issues are as follows:
1. Whether or not the plaintiff sustained an accident in the course and scope of his employment.
2. Whether plaintiff sustained physical injuries rendering him totally and permanently disabled.
3. Whether plaintiff is totally and permanently disabled by reason of a post-traumatic neurosis or from any other nervous or emotional disorder.
This Court by not having the benefit of the Trial Court’s reasons for judgment cannot, of course, presume as to the basis of the Trial Court’s decision. However, after an examination of the entire record this Court can only conclude that the Trial Judge must have based his decision not on the fact of a non-occurrence of an accident but upon the failure of the plaintiff to prove that he sustained any physical injuries which would render him totally and permanently disabled and that he failed to prove that he suffered any disability by reason of post-traumatic neurosis.
The plaintiff alleged in his petition that he suffered an injury while working for the defendant on May 16, 1960. The defendant did not produce any evidence at the trial which would contradict the plaintiff’s testimony in this regard. In addition to this fact Ruckins McKinley, a witness for the defendant, who was working with the plaintiff on that date, testified that although he had not seen the plaintiff hurt himself the plaintiff had told him that he hurt his bade and that Ruckins McKinley advised the plaintiff that if he had hurt his back he should go to the Infirmary. It is true that Ruckins McKinley could not testify as to whether the plaintiff had gone to the Infirmary and that he had not seen the plaintiff sustain any injury, yet there is nothing in the testimony of Ruckins McKinley to indicate that the plaintiff had not sustained the alleged accident.
Mrs. Marlene Zuccaro, who was employed by the defendant as a Registered Nurse and who was on duty on May 16, 1960, at the defendant’s Infirmary testified that she was on duty when Walter Davenport came to the Dispensary; that he told her that he had injured his back; that he had a small abrasion on the back, and that he had informed her that he had raised up under a beam and that she had put an ice pack on it, and had referred him to Dr. McVea. She further testified from a medical record, which is filed in this suit as plaintiff’s Exhibit No. 16, that the plaintiff had reported to the Infirmary at 13:10 hours of 1:10 P.M. The medical report contains a notation under May 16, 1960, “Cont. to back — minor abrasions to Dr. McVea.” Mrs. Zuccaro further testified that the back had been bleeding and that she had placed a dressing on it.
Mrs. Jewel James, the other nurse who was on duty, testified that although she had not seen the plaintiff on May 16, 1960 she recalled the incident and remembered that Mrs. Zuccaro took care of him, and that Mrs. Zuccaro made arrangements to send him to the doctor.
Dr. McVea, to whom the plaintiff was referred by Mrs. Zuccaro, testified that he saw the plaintiff on September 17, 1958 and he had a contusion of his back. There is no question but what Dr. McVea felt that the plaintiff did sustain an accident on May 16, 1960. It is difficult to see, in view of the above, how the Trial Judge could have based his decision dismissing plaintiff’s suit upon the fact that no accident occurred.
Before going into the specific medical evidence introduced at the trial it should be pointed out that the plaintiff’s medical records disclose a long history of back *836 complaints. These medical records which form part of the record of this suit show that the plaintiff reported to the Infirmary 42 times from October 17, 1955 through June 3, 1960 for treatment of his back. The medical records show that on October 17, 1955 plaintiff was treated for a contusion of the right side of his back. During the summer of 1957 he was treated both at the Infirmary and by Dr. McVea for an alleged back injury which will be discussed in greater detail in connection with Dr. Mc-Vea’s testimony. He made three trips to the Infirmary in 1958, six in 1959 and six trips in 1960 prior to the occurrence of the alleged accident of May 16, 1960. In addition to these visits to the Infirmary for injuries to his back, plaintiff from 1949 to 1960 reported to the defendant’s Dispensary a total of 208 times for other various and sundry ailments.
The record does not disclose that the plaintiff was disabled as a result of his back complaints nor is there any evidence that his back ailments caused him to miss any appreciable amount of work.
The record discloses that at approximately 1:10 P. M. on the date of the accident the plaintiff went to the Dispensary and was treated by Mrs. Zuccaro, who testified that the plaintiff had a small abrasion to his back and a contusion. She treated it with an ice pack, bandaged his cut and referred him to Dr. McVea for further treatment. The plaintiff was treated at the Infirmary on May 23, 1960, May 25, 1960 and June 3, 1960. On May 23, while leaving the Dispensary, the plaintiff apparently fainted and was instructed to lie down.
Dr. McVea testified that on May 17, 1960, was the only time that he had ever found any organic back trouble and at that time upon examination of the plaintiff he found he had a contusion of his back and an abrasion of his back, but at no other time had he ever found any physical findings which would make him feel that the plaintiff had suffered an injury or disease of his back. Dr. McVea further stated that in regard to the May 16 injury to the hack that it was his opinion that it would have caused the plaintiff pain and discomfort for a period of approximately six weeks but that when he last saw the plaintiff on June 6, 1960 the contusion was gone and although the plaintiff was still complaining of some pain in the area of the contusion he felt that the plaintiff at that time could resume his work. In fact, Dr. McVea later testified that according to his notes that when he examined the plaintiff on May 25 he felt that whatever abrasions or contusions the plaintiff may have had, had disappeared and that the plaintiff had improved to a point where he felt that the plaintiff could do anything that he could do before the accident.
On cross-examination in answer to a question as to whether or not he believed the plaintiff when he still stated that his back hurt after being discharged on June 6, Dr. McVea testified as follows: “Well, I didn’t believe that his back hurt him enough so he couldn’t work. I have never felt that he was complaining .without having some reason for complaint. I think his back was hurting, but I have not felt he could not work, I felt he could work.”
In connection with the plaintiff’s prior back injury Dr. McVea testified that he had first treated the plaintiff in the summer of 1957 and that he thought that the plaintiff had suffered from a chronic low back strain. He testified that x-rays made on August 20, 1957 showed no evidence of bony trauma or injury and that the x-rays showed that the plaintiff had a slight twisting of his back to the right with a slight upward tilt of the left side of his pelvis which he thought was due to a .8 centimeter shortening of his right lower extremity, but as mentioned above he had not found any physical findings which would lead him to believe that the plaintiff had suffered any disease or injury to his back except at the time of the injury sustained on May 16, 1960.
On September 6, 1960, the plaintiff was referred by Dr. Howard Hansen to Dr. Albert Duane Forman, a neuro-surgeon, *837 who examined the plaintiff on that date and testified as follows: “ * * * When I examined him he had a normal gait, normal weight. He could bend well in all directions though forward flexion of the spine was slightly limited and all movements caused some back pain on extreme ranges. There wasn’t any spasm of the back muscles. He claimed tenderness to pressure over the lumbo sacral area of the spine and over the paravertebral areas each side of the spine at that level. His reflexes were normal, both lower extremities, knee jerks and ankle jerks. There was no. apparent atrophy or weakness of the muscles of the lower extremities and he didn’t claim any disturbance in sensation over the lower extremities when tested with a pin.”
Dr. Forman had copies of x-rays made by Drs. Robert and Geheber at the request of Dr. Hansen which showed as follows: “ * * * These films of the low back and pelvis revealed no abnormalities, other than 1.6 centimeter relative shortening of the right lower extremity, with a slight tilt of the spine compensatory to1 this shortening of the lower extremity, a tilt of the pelvis. There was also a tilt of the lower spine toward the right as well as a tilt in the pelvis. I thought that he might very well have a ruptured disk though he didn’t have true sciatic radiation of his back pain. He had radiation into the posterior thigh. I thought he might also have chronic postural backache from his short leg and tilt of the pelvis and the spine. * * * ”
Dr. Forman again examined the plaintiff on January S, 1961 wherein the plaintiff complained that his condition was worse and stated that he felt that the plaintiff’s symptoms showed a possible ruptured disk and suggested a myelogram. This was made on January 23 and was completely negative. Thus ruling out a posteriorly ruptured disk. Dr. Forman again saw the plaintiff on February 17, 1961, and stated that he had no record of an examination made at that time but that he discussed with the plaintiff a possibility of making a disk-ogram which would show whether or not the disk was ruptured laterally. However,' this was never made. Dr. Forman felt that there was a possibility of some physical, difficulty in the plaintiff’s back which had not been found but testified that he was unable to find any objective physical symptoms of any injury.
In this regard Dr. Forman testified as follows :
“Q : Doctor, in your examination of September 6, 1960 you found this man to be from an objective medical standpoint, he was normal was he not?
“A: Yes, except for the postural fault he had.
“Q: And that would be congenital, would it not ?
“A: Yes sir, that’s right.
“Q: Is that what you refer to as scoliosis of the spine?
“A: Well, he had a scoliosis, but I wouldn’t say it was congenital. It was developmental, one leg didn’t develop quite as long as the other.
“Q: That would develop over the years, would it not?
“A: Yes, he had had that, I am sure, since he obtained his full growth.
“Q : Otherwise you found no defects from an objective point of view neurologically or orthopedically speaking?
“A: That’s right.”
It is interesting to note that Dr. Forman was not convinced that the plaintiff had a psychosomatic disorder. He testified that “ * * * the man’s symptoms were too discreet and too persistently the same, consistent from one examination to the other, and it fit the pattern too much of disk disease to make it likely that it was a neurotic reaction he was having.” He further testified that “ * * * this patient’s symptoms weren’t typical of disk either in some respects. He didn’t have pain all the way down his leg, for example. I think if he *838 had been aware of the disk symptoms it would have been a sciatic pain. He didn’t have a sciatic pain.”
From the foregoing it is clear that Dr. Forman was unable to find any objective symptoms which would indicate that the plaintiff was physically disabled.
The plaintiff was examined by Dr. Joseph Edelman, a neurosurgeon, at the request of defendant’s attorney on January 20, 1961. Dr. Edelman had x-rays made by Drs. Ma-len and Woolfolks which said x-rays disclosed no fractures or dislocations or spon-dylolistheses. The x-rays also showed that there was no destructive lesion of the bone, no disk innerspace narrowing was seen, no arthritic or degenerative changes were present. He further stated that he examined the x-rays made by Drs. Robert and Gehe-ber above referred to and that they showed no difference in the appearance of the bony structures of the lumboastic spine. In summary Dr. Edelman testified as follows:
“Q: On the basis of all these studies and tests that you performed on Davenport, doctor, you have concluded, I believe, that he showed no evidence of any injury to his back whatsoever, did you not?
"A: That is correct. It was my opinion that he showed no evidence of a herniated or ruptured intervertebral disk, and I found nothing to suggest the presence of nerve root compression. These conclusions were based on the fact that the patient had no mechanical limitation of motion of his back and that he had no neurological abnormality on examination.
“Q: Some of these tests which you performed, like the Patrick test, the Ba-binski test and the pin prick and sensitivity test, they were aimed primarily at determining the presence or absence of a disk, is that right ?
“A: That’s correct.
“Q: And they all showed entirely negative ?
“A: That’s correct. ■
“Q: Did you find any basis whatsoever for the patient’s complaints as he voiced them to you?
“A: No sir, I could not.
“Q: And of course you did not consider him disabled in any sense at that time, did you doctor?
“A: That is correct, I did not.”
It is apparent from the medical testimony that the Trial Judge must have concluded that the plaintiff was not totally and permanently disabled because of any physical injury. Therefore, this Court must now address itself to the question as to whether or not the plaintiff’s alleged disability was caused by post-traumatic neurosis, or, by some other emotional disturbance, superin-duced by an injury suffered by the plaintiff. That this fact is the central issue to this case is further borne out by the fact that the plaintiff’s brief deals almost exclusively with the question of post-traumatic neurosis.
As it is true in many of the cases of this nature plaintiff’s case in connection with the question of neurosis is based on a testimony of a single witness, Dr. George Burke, a psychiatrist, who examined the plaintiff for approximately one hour on March 23, 1961. Dr. Burke had copies of medical reports to assist him in his evaluation. Dr. Burke did not examine the plaintiff from a physical standpoint. Plaintiff’s background, education and other relative matters were considered.
The examination of the plaintiff by Dr. Burke revealed that he showed no evidence of delusions or hallucinations nor did he show any signs of a serious mental disorder or of a psychiatric nature or of a mental deficiency. Dr. Burke found the plaintiff to be of a normal range of intelligence. Dr. Burke testified that the main thing that was brought out in the examination was the plaintiff’s pre-occupation with his back. This pre-occupation went back to *839 his alleged initial injury and to his various complaints and treatments over a period of years. The plaintiff revealed that he was very bitter about his belief that he had not been fairly treated by his ex-employers, part of which was based on his belief that the doctors had not helped him. He did have some neurotic symptoms mainly agitation, restlessness, irritability, depression, inability to sleep well, and some changes in temperament.
Dr. Burke, who testified at some length in this case, was not certain as to his diagnosis. He was not sure whether the plaintiff was still suffering from a physical ailment. He stated that although he felt that the plaintiff was in pain and was really relating symptoms that bothered him a great deal, that his evaluation of this fact was not complete; that he couldn’t come down to a complete understanding of it.
Dr. Burke felt that the plaintiff was either suffering from a traumatic neurosis or from a reactive depression. In this regard he testified as follows: “ * * * But if, let’s say speculating that there were no physiological reasons at this time for the persistence of the complaints, realizing that the thing was set off in the beginning by an injury and that it would come under the classification prehaps of the traumatic neurosis in that the shock of the injury, the after effects of it, set off this neurotic reaction from which he has not recovered. However, if the physiological illness is still a big factor in producing his pain, I would prefer to call it a reactive depression.”
Dr. Burke further testified that he felt that the plaintiff needed further psychiatric treatment and stated that although he felt that it was a crippling disorder and that it limited the plaintiff’s ability to perform that he did not know the exact limitations. Dr. Burke was not sure of what had started the plaintiff’s problem in the first place but felt that an injury started it in the first place, but that it was apparently something, some unconscious idea about himself that made him a cripple but that was all speculation on the basis that he didn’t have something physically wrong with him.
Dr. Burke was unable to give a definite opinion as to whether or not the plaintiff was able to work or as to what effect the plaintiff’s being laid off had on his condition.
In answer to the following question, “Doctor, you don’t really know that even at the time of your interview here in March of 1961 whether the man could have been at work, you don’t know?” he answered, “I don’t know that, that’s right.” He further testified in this regard as follows:
“Q: Yes, assuming he worked after this injury and then claimed he couldn’t work after he was laid off, isn’t that a pretty clear indication that it was the laying off part that caused his disability, psychiatrically speaking?
“A: Well, if you could assume that he put in a full day’s work and wasn’t having any trouble and then he started saying he couldn’t work at all after he got laid off that would be an indication that the laying off was an important factor.
“Q: But at any rate you don’t know whether he — I mean you just said that you didn’t know even at the time of your interview whether or not this man could work?
“A: I feel that he is limited by this illness, regardless of whether its physical or of a neurotic nature. Just how limited he is I am not sure.
“Q: You are not prepared to say?
“A: I prefer to know more about what is wrong with his back.”
Dr. Burke was also not sure whether the injury of May 16, 1960 was an aggravated factor to the plaintiff’s neurosis or to his back injury or to his condition in general. The only definite statement he could make *840 was that the injury of May 16 made things worse and seemed to add to rather than be the original source of the plaintiff’s trouble. It should be further pointed out that no where in his testimony does Dr. Burke indicate the degree of the disability of the plaintiff and whether or not he is permanently disabled from performing the same work that he performed prior to the incident of May 16, 1960, and his being laid off.
In view of the above, the best that can be said in regard to Dr. Burke’s testimony is that it is inconclusive and it is apparent that Dr. Burke’s examination was incomplete and that Dr. Burke was not fully satisfied as to the nature and extent of the injury of the plaintiff.
In regard to the statements by Dr. Burke concerning the effect of the laying off on the plaintiff’s condition it should be pointed out that as mentioned above the record clearly shows that although the plaintiff had been complaining of a back injury off and on since 1955 it had not caused him to lose any appreciable time from work during the whole period and in fact there is no evidence in the record that the plaintiff ever was disabled until after he was laid off. The record shows that after the plaintiff sustained the alleged injury to his back on May 16, 1960, he was paid for eight hours of work on May 17, 1960, eight hours on May 18, eight hours on May 19 and 20, one hour on May 23, eight hours on May 25, 26, 27, 28, 29 and 31. On May 30 he received eight hours holiday pay but did not work. The record further shows that there is no doubt but what the plaintiff performed work similar to that he ordinarily did after his injury on May 16.
Mr. Hugh Waddle, who was employed by the defendant as a foreman testified that the plaintiff worked for him on May 29, 1960 and that he had worked “from 3:00 o’clock in the afternoon until 7:00 P.M.” and that he did routine general clean up, his normal duties during the first part of the day and during the second part of the day had been sent to work in the calcination department and had done routine normal work there.
Mr. William Virgil Bloodworth, who was also employed by the defendant as a foreman testified that the plaintiff had worked under his direction on the “C” shift which is 3:00 P.M. to 11:00 P.M. on the 25th and 28th of May, 1960 and that on the 25th he worked on regular clean up doing clean up work in the tunnel on number six belt on the Jamaica relay system and that he had worked the entire shift of eight hours and that on the 28th he worked eight hours and that his duties consisted of beating down with a sledge hammer the sides of railway hopper cars. Mr. Bloodworth upon extensive cross-examination was unshaken in his testimony that the plaintiff had performed his regular duties. In addition to the testimony of the foreman, Andrew Henry, who was employed by the defendant stated that Walter Davenport had worked with him sometime around the 17th, 18th, or 19th of the month, that the plaintiff was able to do the work that he was supposed to have done.
The only evidence concerning the ability of the plaintiff to work after he was laid off is his own testimony to the fact that he had attempted to work for his brother, who was a cement finisher contractor, and had been unable to do so. However, the plaintiff did not produce any corroborating witnesses to this fact.
It is elementary that a plaintiff in a compensation suit must as in all litigation establish his case by a preponderance of the evidence. “Edwards v. Aetna Casualty and Surety Co., La.App., 108 So.2d 126; A. Squyres v. Western Casualty and Surety Co. et al., La.App., 107 So.2d 837; Page v. Tremont Lumber Co., La.App., 108 So.2d 1.” Scott v. Roy O. Martin Lumber Co., La.App., 116 So.2d 726.
It is also well established that nervousness, neurosis, or emotional dis *841 turbances superinduced by injuries suffered by a workman can be just as devastating to the ability to return to work as are physical or anatomical injuries and are equally compensable under the statute. “Tate v. Gullett Gin Company et al., La.App., 86 So.2d 698; Buxton v. W. Horace Williams Co., 203 La. 261, 13 So.2d 855; Dupre v. Wyble, La.App., 83 So.2d 119; Ladner v. Higgins, La.App., 71 So.2d 242.” Miller v. United States Fidelity & Guaranty Corporation, La.App. 2 Cir., 1957, 99 So.2d 511.
“It is also settled by the jurisprudence of this state that an employee who predicates a claim for total permanent disability upon neurosis induced by trauma bears the burden of proving by a preponderance that the neurosis exists and that it was caused by an accident occurring during the course of his employment. Mouton v. Gulf States Utilities Co., La.App., 69 So.2d 147.” Franklin v. Cashio, La.App., 111 So.2d 536.
Plaintiff on appeal is basing his case primarily on the proposition that in view of the uncontradicted testimony by Dr. George Burke as well as his own testimony that he did suffer conversion reacting of traumatic neurosis from his injury during the course and scope of his employment and this condition has disabled him from working since May 16, 1960.
He further contends that the conclusive testimony of Dr. Burke, the only psychiatrist who testified, should be accepted and that the judgment of the Trial Court be reversed.
The plaintiff .relies primarily on the case of Guidry v. Michigan Mutual Liability Company, La.App., 130 So.2d 513 and of Williams v. Bituminous Casualty Corporation, La.App., 131 So.2d 844 in this regard contending that since the testimony of Dr. Burke is unrefuted did constitute sufficient proof of the plaintiff’s disability from neurosis.
While, as this Court stated in the Charleston v. American Ins. Co., La.App., 136 So.2d 495 (Writs denied) case that it was in accord with the holding in the Guidry v. Michigan Mutual Liability Co., and Williams v. Bituminous Casualty Corp. cases, supra, in view of the facts particular to those decisions this Court does not consider them decisive in the case at bar. What this Court said in the Charleston v. American Ins. Co. case is .appropriate herein. In the Charleston case this Court held:
“That each case must be decided in the light of its own peculiar facts and circumstances is a legal axiom so universally accepted no citation of authority in support thereof is deemed necessary. Equally well recognized is the principle that plaintiff must establish his case (even one for workmen’s compensation benefits) by a fair preponderance of credible evidence. * *
“Although we are aware that in at least one of the cases relied upon by learned counsel for plaintiff herein, compensation for disability induced by neurosis has been awarded on the un-contradicted testimony of a single psychiatrist, we are likewise cognizant of authority holding to the contrary under circumstances remarkably similar to those in the case at bar. A paramount difference between the Guidry and Williams cases, supra, relied on by plaintiff herein is that in both said instances the trier of fact decided the issue in favor of the employee whereas in the case at bar the factual question was initially adjudicated adversely to plaintiff. We do not wish to be understood as talcing issue with the propriety of the decision rendered by our brothers of the Second Circuit (in the Williams case, supra) or those of our brothers of the Third Circuit (in the Guidry case, supra) for we adhere to the principle that there can well be instances wherein the evidence as a whole may be considered sufficient to prove disability resulting from *842 neurosis even though the record may contain the testimony of but a single psychiatrist.
“We believe, however, the facts of the instant case more properly fall within the rule of Franklin v. Cashio, La.App., 111 So.2d 536 and Rowan v. Travelers Insurance Company, La. App., 111 So.2d 387, the former decided by this court against the employee despite the unrefuted testimony of a psychiatrist appearing in the record and the latter having been determined in favor of the employer by the Fourth Circuit (formerly Orleans) notwithstanding two psychiatrists were called by plaintiff and none by defendant employer.”
See also Mouton v. Gulf States Utilities Company, La.App., 69 So.2d 147 wherein the Court held that the testimony of a psychiatrist based upon two question and answer periods of 45 minutes each did not constitute proof of traumatic neurosis by a clear preponderance of the evidence. See also Phillips v. Underwriters at Lloyd’s of London, La.App., 128 So.2d 318.
In the instant case Drs. Forman and Edel-nian, both competent neuro-surgeons, could find no objective medical symptoms which would explain plaintiff’s alleged disability. Both Drs. Edelman and McVea testified that the plaintiff was able to work and was not disabled.
Conversely, the only medical testimony touching upon the plaintiff’s disability is that of Dr. Burke, whose testimony was inclusive and who could only state that the plaintiff was limited by his disability but who could not determine as to the degree of the limitation and who further stated that he could not say that the plaintiff was unable to work. In this regard it should be pointed out that in the cases of Tate v. Gullett Gin Co., 86 So.2d 698 and Doucet v. Ashy Construction Co., La.App., 134 So.2d 665. upon which the plaintiff also relies the testimony of the psychiatrist in those cases were definite as to the disability of the employee.
In viewing the medical testimony together with the fact that the record does not disclose that plaintiff was disabled and unable to work until after his employment was terminated it cannot be said that the Trial Judge was incorrect in resolving the factual issue of disability against the plaintiff. From the evidence we find no manifest error in this regard and accordingly the findings of the Lower Court is affirmed.
Affirmed.