DOMENGEAUX, Judge.
This is an action for Workmen’s Compensation benefits along with penalties and attorney’s fees, brought by plaintiff as a result of an accident which occurred on February 22, 1968. At that time plaintiff was employed by defendant as a “picker-packer,” whose function is to fill orders for parts by picking the required parts from their storage bins and packing them for shipment.
On the date in question plaintiff was engaged in unloading some automobile fenders from a fork-lift machine when he struck the right temporal area of his head on a piece of metal that was projecting from one of the parts bins. Plaintiff says he felt a sensation of warmth on the affected area as though he were bleeding and he called to a fellow employee, one Mr. Klein, for assistance. Mr. Klein came to his aid, taking him to the men’s room and applying paper towels soaked in cold water to plaintiff’s head. Following this treatment both Mr. Klein and plaintiff returned to their labor and finished out the working day. Plaintiff stated that he advised his foreman “in a joking manner” that he had struck his head.
The following morning plaintiff reported to his supervisor that he had experienced headaches during the night and he requested medical attention. He was sent to Dr. Ernest Celli, the company physician. Dr. Celli performed a thorough examination of plaintiff and found only a contusion and abrasion of the right temporal area. Other than that his physical examination was completely negative. Plaintiff told the doctor about the blow to his head and also that there had been no loss of consciousness, disturbance of vision, or nausea following the accident. Dr. Celli gave plaintiff a prescription for darvon, a common headache remedy and let him go. The week end passed and on Monday, February 26, plaintiff returned to see Dr. Celli complaining of headaches, drowsiness, and fever. Again the doctor performed an examination which proved negative and he advised plaintiff to take the darvon only at night since it could be the cause of the drowsiness.
Plaintiff next sought medical attention the following day, Mardi Gras, when he felt faint while watching a parade. He was taken by his family to Mercy Hospital in New Orleans and was there treated by Dr. Raeburn Llewellyn, a neurosurgeon, until he left the hospital on March 2, 1968. Dr. Llewellyn stated that the plaintiff gave him no history of trauma to the head but *408 that the only history he obtained at that time was of headaches preceded by a flu-like episode. A thorough physical examination, including a spinal tap, was performed on plaintiff and proved negative in its results. The doctor testified that he would have performed the same examination had he been given a history of trauma. He specifically stated that he examined plaintiff’s head, scalp and skull but found no abnormalities, only five days after the accident. It occurred to Dr. Llewellyn that there could be emotional factors precipitating plaintiff’s problem but he concluded that the most likely diagnosis was one of viral inflammation of the brain as a result of the flu-like condition, and released plaintiff to the care of his own physician on that suspected diagnosis.
Plaintiff next sought medical help on August 5, 1968, when he went to see Dr. Frederick Pou. He had seen Dr. Pou once before, in 1966, at which time he had related a history of migraine headaches in his childhood. On his 1968 visit, Dr. Pou hospitalized plaintiff and on the following day performed some tests. The tests showed no abnormality and following treatment with sedatives plaintiff was discharged from the hospital on August 13, 1968. Dr. Pou did not think that plaintiff’s complaints were compatible with the type of blow that he had sustained. He diagnosed plaintiff’s ailment as migraine headaches but recommended that he see a neurosurgeon for further evaluation.
The neurosurgeon turned out to be Dr. Llewellyn who again saw plaintiff on September 18, 1968. On this occasion Dr. Llewellyn was informed of the traumatic accident that plaintiff had experienced but he again concluded that there was no organic disorder to account for the headaches. He advised Dr. Pou that plaintiff’s headaches were most likely of an emotional origin and recommended that he be referred to a neuro-psychiatrist.
The next physician consulted by plaintiff was Dr. Emile J. Bertucci, Jr., whom he visited on October 15, 1968. Dr. Bertucci also hospitalized plaintiff for extensive and thorough medical tests. The only cause that he could find for plaintiff’s headaches was tension and he administered tranquilizers. Of the blow to plaintiff’s head eight months earlier, Dr. Berticci could only say that it “possibly could have been one of the precipitating factors’’ producing the tension that caused the headaches.
Plaintiff next consulted Dr. Harry Phili-bert, whose field of expertise, the killing of pain by means of trigger point injections of anesthetic into certain supraspi-nous ligaments, was so novel as to preclude his acceptance by the trial court as an expert witness in that field. Dr. Philibert first saw plaintiff on November 1, 1968, at which time he conducted a physical examination that revealed pain in the right temporal area. The doctor stated that he then re-examined plaintiff, “trying deliberately to trip him up” to determine whether he was a malingerer, and concluded that he was not. This physician was of the opinion that plaintiff’s headaches were due to the blow that he had received nine months earlier. Dr. Philibert treated plaintiff with his method of injection and with various drugs for slightly more than six months, but failed to clear up his ailments. The doctor diagnosed plaintiff’s affliction as being cervical plexus nerve root pressure involving neuralgia of the cervical nerves and also trigeminal neuralgia specifically of the right temporal nerve. He did concede however that plaintiff had, “a lot of emotional overlay.”
On the 9th of December 1968, plaintiff consulted another neurosurgeon, Dr. Juan Carlos Pisarello, on a referral from Dr. Celli. Dr. Pisarello took a history from plaintiff in which he specifically stated that he had not received a direct blow from the piece of metal at the Ford Plant but rather that he had merely felt some pressure from it upon his right temple. Plaintiff also told this physician that he had begun having headaches only three *409 days after his accident and that he had felt very well for the intervening three days. Dr. Pisarello conducted a complete neurological examination which was entirely within normal limits. The only peculiarity he noticed was the fact that “palpation of plaintiff’s right carotid artery” produced some local pain and compression of this artery resulted in elimination of plaintiff’s headache. This, said Dr. Pisarello was indicative of tension headaches. This physician was of the opinion that plaintiff’s headaches were caused by tension and were unrelated to the accident that he had sustained.
Plaintiff’s attorney referred him to Dr. Carl Culicchia, a neurosurgeon, whom he saw on March 28, 1969. Dr. Culichhia performed a neurologic examination on plaintiff and found that he had not sustained any injury to the central nervous system and that there was no neurologic explanation for plaintiff’s complaints. This physician found no signs of trigeminal neuralgia or cervical plexus nerve root pressure, which in essence, had been Dr. Philibert’s diagnosis and he stated that he saw no need for the treatment that Dr. Philibert was administering to plaintiff or for any other treatment. He further stated that in his opinion plaintiff could have returned to his usual occupation at Ford Motor Company.
Finally, also on his attorney’s referral; plaintiff consulted Dr. Charles R. Smith, a psychiatrist. Dr. Smith diagnosed plaintiff’s trouble as being tension headaches aggravated by stress, aggravation, irritation, mood changes, family disorder, etc., along with an anxiety neurosis. This physician thought plaintiff to be obsessed with his health, particularly insofar as his head is concerned and believed the origin of his ailment to lie in the blow to his head. However in making this connection between the accident and the continuing headaches, he relied primarily on the history that he was given by plaintiff. Dr. Smith also acknowledged that other factors might precipitate a condition such as plaintiff’s, as for example, an emotional experience, a change in family relationships, and a need for security, recognition or attention.
The record discloses that plaintiff was indeed afflicted with emotional experiences, changes in family relationships, etc. Plaintiff lived approximately one-half mile from his parents and was apparently quite close to them, seeing them daily. Both parents were diabetics and his father having injured his toe, developed gangrene, necessitating the removal of the toe. Shortly after that the father again injured his foot and half of it had to be amputated. Next he injured his other foot, gangrene set in, and his leg was amputated. A week later, apparently as a result of the last operation, the father died from a blood clot, on May 25, 1968, three months after plaintiff’s accident. On that same day plaintiff’s mother suffered a heart attack and was precluded from attending her husband’s funeral. She too had undergone amputations, first of a toe and then of a leg. Two months later she also passed away. On February 12, 1968, ten days before his accident, plaintiff was cast in judgment in a suit by Chrysler Credit Corporation for the balance due on a note he had executed for the purchase of an automobile. As a result garnishment proceedings were undertaken against him and he was told by a Mr. Lafitte at Ford Motor Company to act promptly because he would be fired rather than have his wages garnisheed. Two months later because of this and other financial difficulties, including an obligation arising out of an automobile accident that he had caused in 1965, plaintiff went into bankruptcy. Surely these personal tragedies are sufficient to produce tension headaches in any man, but specially so in one who is predisposed to neurosis as Dr. Smith said plaintiff was.
Of the eight physicians that plaintiff consulted, only one, Dr. Philibert, could say that there was any organic reason for *410 plaintiff’s complaints. He claimed to have found nerve damage where some of the area’s most prominent neurosurgeons could not. This court cannot say that the other seven physicians who considered plaintiff’s headaches to be the result of tension and emotion were wrong and Dr. Philibert was right. Of the other seven, only one, Dr. Smith, traced plaintiff’s headaches to the accident of February 22, 1968, and he conceded that there were many other factors-which could account for the headaches and that his connection between them and the accident was based primarily on the history given him by plaintiff during his three interviews with him. Therefore, in view of the many misfortunes suffered by plaintiff around the time of his accident at Ford and of the bases of Dr. Smith’s conclusions we cannot assign much weight to his testimony either. Junker v. Toye Brothers Yellow Cab Company, La.App., 163 So.2d 150. Further, although we do not regard it as having great probative value, we deem it necessary to consider that plaintiff in registering for the Selective Service System stated that he had a history of frequent or severe headaches and that he had consulted a physician for these in 1963, although he had no such complaints in the immediately preceding year.
 The jurisprudence of this state is well settled that a plaintiff in a Workmen’s Compensation case may recover for disability resulting from a neurosis. However such claims are no different from those involving organic injuries in that they must be established to a legal certainty by a preponderance of the evidence. Bailey v. Avondale Shipyards, Inc., La.App., 198 So.2d 409; and cases cited therein. We are of the opinion that the plaintiff in this case has failed to so establish his claim. Mouton v. Gulf States Utilities Co., La.App., 69 So.2d 147.
For the reasons assigned the judgment of the trial court is affirmed. Costs of this appeal are to be borne by appellant.
Affirmed.