346 So.2d 268 (1977)
Joseph JENNINGS
v.
HALLIBURTON COMPANY, IMCO Drilling Mud, Inc., Highland Insurance Company.
No. 8236.
Court of Appeal of Louisiana, Fourth Circuit.
May 17, 1977.
*269 Badeaux, Discon, Cumberland & Barbier, Fernand L. Laudumiey, III, New Orleans, for plaintiff-appellant.
Phelps, Dunbar, Marks, Claverie & Sims, Esmond Phelps, II, New Orleans, for defendants-appellees.
Before SAMUEL, REDMANN and BEER, JJ.
SAMUEL, Judge.
Plaintiff, Joseph Jennings, filed this suit against Halliburton Company, IMCO Drilling Mud, Inc., and Highlands Insurance Company, seeking to recover workmen's compensation benefits for permanent and total disability at the rate of $65 per week for 500 weeks as a result of an injury he sustained on November 19, 1973. Defendants answered, admitted plaintiff was injured, but denied plaintiff was disabled beyond February, 1974, when compensation benefits were terminated.[1]
After a trial on the merits, judgment was rendered in favor of the defendants, dismissing plaintiff's suit at his cost. Plaintiff has appealed.
The record reveals plaintiff was employed by Halliburton as a truck driver and part of his functions included loading and unloading heavy material from his truck. On November 19, 1973, he was returning from such a delivery when he became comatose from gas escaping from his truck's faulty exhaust system. The truck left the road and crashed into a telephone pole, throwing plaintiff through the windshield. The issue in this court is whether or not plaintiff is disabled by reason of a neurosis caused or aggravated by the accident.
Plaintiff does not remember the accident. His recollection began in the hospital where he was brought for observation. He received a concussion, multiple contusions, and multiple abrasions of the left knee, left arm, nose and face. He also received cervical and lumbosacral strains.
Upon release from the hospital, he was treated by defendant's physician, Dr. William Gadow. He was also seen on a consulting basis by specialists in orthopedics, neurosurgery, and otholaryngology. Dr. Gadow concluded plaintiff was able to resume his normal occupational duties on March 1, 1974, four and one-half months after his injury.
Before Dr. Gadow released plaintiff, he obtained an evaluation of plaintiff's condition from Dr. Thomas Tate, an otholaryngologist. Dr. Tate's examination was negative, except that he discovered a hearing loss of 31% in plaintiff's right ear and 28% in his left ear. Not having seen plaintiff prior to his accident, Dr. Tate could not state the accident caused the hearing loss, but he indicated plaintiff's injuries were sufficiently severe to have caused the condition. On May 19, 1975, plaintiff was seen by another physician who found only a hearing loss of 2.5% in the right ear and 5% in the left. Dr. Tate again tested plaintiff on September 15, 1975 and arrived at basically his original findings.
Plaintiff returned to work, but complained of severe back pain when he attempted bending or lifting. Apparently as a result of conflict with his employer, he voluntarily left his employment on March 15, 1974. However, he continued to consult physicians because, as he testified, of his pain. None of these physicians could find objective symptoms to substantiate his complaints; *270 the consensus of their diagnosis was an acute cervical and lumbosacral strain which had healed. Among these physicians was Dr. Rayburn C. Leuwellen, a neurosurgeon.
Because plaintiff, again as he testified, experienced increased emotional problems, he sought psychiatric help from Dr. Alvin Cohen. Dr. Cohen, the only psychiatrist who testified, diagnosed plaintiff's condition as a severe anxiety neurosis with depression. In his opinion the condition was precipitated by plaintiff's injury. Dr. Cohen's reasoning was based on plaintiff's performance of his job duties without difficulty until the accident, which was the only injury suffered by plaintiff (according to the information Dr. Cohen received from plaintiff) and which he thought was sufficiently severe to cause such a neurosis. Dr. Cohen further felt plaintiff had a predisposition to a neurosis of this type because of his extremely low intellectual level. However, he detected no hearing difficulties and stated plaintiff's responses to his questions indicated plaintiff heard very well.
Plaintiff testified he worked for several employers since the accident, but his duties only involved truck driving and light work. He said he could no longer perform heavy duty, including bending and lifting, as he had done before the accident without substantial pain. He further testified he had worked only seven and one-half months in the interval between the accident and the trial. This testimony was inconsistent with statements made by him in discovery, and the discrepancy formed part of the trial judge's reasons for doubting plaintiff's veracity.
The trial judge rendered extensive reasons for judgment, the nexus of which is that he simply did not believe the plaintiff's testimony or believe that the plaintiff was disabled after March 1, 1974.
The record shows plaintiff worked after his discharge, and that he did not accurately relate these and other facts to Dr. Cohen. Dr. Cohen's testimony clearly shows he placed no importance whatever on the misstatement by plaintiff to him regarding employment activities. He stated at trial he would have reached the same diagnosis no matter what plaintiff had said, essentially because of plaintiff's low intellectual level. Also significant is Dr. Cohen's testimony regarding the connection between plaintiff's neurosis and his physical symptoms. When asked how a neurosis can cause physical symptoms, Dr. Cohen responded that when plaintiff thinks about his problems his mind generates impulses which travel throughout his body and focus on various parts thereof, such as his neck or back. Dr. Cohen stated these impulses are perceived by plaintiff as pain because plaintiff's muscles actually go into spasms. Dr. Cohen further stated in his opinion the pain is very real to plaintiff because the muscle spasms grow progressively worse. However, on cross examination Dr. Cohen admitted he did not see plaintiff in muscle spasm because he conducted no physical examination whatsoever.
In Canter v. Koehring Company,[2] the Supreme Court set forth the broad discretion given to the trier of fact, especially in areas of credibility of witnesses. The trial judge simply did not believe plaintiff's testimony, which was contradicted in part by his own psychiatrist. There is nothing in the record to indicate the trial judge committed error by arriving at this conclusion.
While Dr. Cohen's testimony stands uncontradicted in the record, its contents disclose the trial judge did not commit error in disregarding it It is the duty of the trial judge to evaluate the testimony of all the witnesses, both lay and medical. After making such an evaluation, he may accept or reject the opinion expressed by any medical expert, depending on how impressed he is with the qualifications, credibility, and testimony of that expert.[3] In short, the trial judge is obliged to evaluate *271 testimony of a medical witness according to the same rules applicable to other witnesses.[4]
The psychiatrist's testimony was predicated both on incorrect statements derived from plaintiff and on the presupposition, unsubstantiated by physical examination, that plaintiff suffered muscle spasms.
This court handled a similar problem in Richards v. Travelers Insurance Company,[5] in the following manner:
". . ., we cannot say that he manifestly erred in choosing to disregard Dr. Graham's opinion. That opinion was based upon one forty-five minute interview with Richards and necessarily depended upon factual representations made by Richards to Dr. Graham. If the trial judge, in painstakingly considering all of the testimony and related evidence, had come to the conclusion that Richards' representations were not worthy of belief, then he surely had a right to conclude that Richards' representations to Dr. Graham were, likewise, so tainted. His testimony could not be `laundered' simply by passing it into Dr. Graham's ears and out Dr. Graham's mouth in different words but based on the same representations."
Considering the entire record, we are of the opinion the trial judge committed no error in holding the plaintiff did not prove his case by a preponderance of the evidence. In cases involving a condition such as the one presented here, the court must proceed with utmost caution and exercise extreme care because of the nebulous characteristic of such a condition and the possibility of the symptoms being feigned. Evidence in cases of this nature should be scrutinized carefully and every precaution taken to protect employers and insurers against unjustified claims because of alleged mental affliction.[6]
For the reasons assigned, the judgment appealed from is affirmed.
AFFIRMED.
NOTES
[1] In defendants' answer, it was explained the proper defendant was IMCO Services, a division of Halliburton Company. In addition, plaintiff voluntarily dismissed Highlands Insurance Company upon learning it did not insure the defendant.
[2] La., 283 So.2d 716, 724.
[3] Matirne v. Wilson, La.App., 336 So.2d 960; Touchet v. Fidelity and Casualty Co. of New York, La.App., 264 So.2d 752.
[4] Matirne v. Wilson, Id.; Frame v. Majors, La. App., 224 So.2d 65; Williams v. Southern Advance Bag & Paper Company, La.App., 87 So.2d 165.
[5] La.App., 327 So.2d 620, 623.
[6] Andrus v. Rimmer & Garrett, Inc., La.App., 316 So.2d 433.