352 So.2d 732 (1977)
Shirley GIBSON
v.
NEW ORLEANS PUBLIC SCHOOL BOARD.
No. 8829.
Court of Appeal of Louisiana, Fourth Circuit.
November 10, 1977.
Rehearings Denied December 13, 1977.
*733 Polack, Rosenberg, Rittenberg & Endom, Lawrence W. Koltun, New Orleans, for defendant-appellant.
Cameron C. Gamble, New Orleans, for plaintiff-appellee.
Before LEMMON, STOULIG and BEER, JJ.
BEER, Judge.
Shirley Gibson, age 34, had been recently employed by the school board to do custodian type work when she allegedly slipped and fell in the course of mopping the floor at Colton High School; this compensation suit resulted.
The trial court found that she had suffered a back sprain causing physical disability which persisted until the time of her discharge by her treating physician. Furthermore, the trial judge concluded that Gibson's "adjustment reaction of adulthood with features of paranoia" (the descriptive diagnosis of the only psychiatrist who testified) resulted from the same slip and fall incident. This condition, the judge observed, was a "major factor in the mental demise" of Gibson. He cited Sanderson v. Employers Liability Assurance Corporation, 181 So.2d 869 (La.App. 4th Cir. 1966), and Laborde v. Martin, 316 So.2d 437 (La.App. 3rd Cir. 1975), (which we find totally inopposite) in support of his conclusion that in spite of her discharge by her own physician, Gibson was disabled as a result of an emotional and mental condition and thus entitled to judgment in the amount of $65.00 per week for 500 weeks plus interest, etc.
Appellant, Orleans Parish School Board, contends that the trial court erred in holding that the minor trauma which plaintiff sustained on July 2, 1975 caused plaintiff's alleged "adjustment reaction of adulthood with features of paranoia;" in holding that plaintiff's "adjustment reaction of adulthood with features of paranoia" disables her; alternatively, in ruling that plaintiff's *734 "adjustment reaction of adulthood with features of paranoia" permanently disables her; alternatively, in holding that the injury which plaintiff sustained on July 2, 1975 disabled her through May 15, 1976; and, alternatively, in establishing the rate of disability benefits at $65.00 per week.
Immediately following the alleged slip and fall, Gibson was examined by Dr. Arthur Axelrod, a general surgeon, who performed a straight leg raising test, a neurological examination, and other examinations and found no signs of any external trauma. He diagnosed a contusion to the left lumbar area. Subsequent reexaminations by Dr. Axelrod and also by Dr. Richard Faust produced no objective findings. She was discharged as able to return to work within two weeks following the incident.
Gibson's attorney then recommended that she consult Dr. Vernon Kroll, who found no signs of external injuries at his initial examination or at any time during the course of his consultations with Gibson which lasted from July 30, 1975 through May 15, 1976. He did find voluntary limitation in forward bending movement and in the straight leg raising test, and, on that basis, diagnosed back strain and instituted physical therapy treatments which continued until he discharged her on May 15, 1976. During this time, Gibson complained about her knee, so Dr. Ray Haddad, an orthopedist to whom Dr. Kroll referred Gibson, examined her and found nothing wrong with her knee. In October 1975, Gibson contends that she began "talking funny and I'd get a choking like I'm going to pass out." She testified that she was treated at Charity Hospital for this emotional disturbance and was then referred to the New Orleans Mental Health Center, where she was evaluated by Dr. Roger Anastasio, staff psychiatrist, in December, 1975. He found that she was experiencing "adjustment reaction of adulthood with features of paranoia." This psychiatrist testified at the trial that Gibson could not function properly in an employment situation because of her difficulty in dealing with authority figures. He further testified that although she had been doing well in March of 1976, her condition deteriorated in the last couple of months before trial and, though it was his conclusion that she would probably "recover," she was, nevertheless, disabled now. He felt that Gibson's condition was neither a neurosis nor a psychosis, but an anxiety reaction which could have been triggered by any number of events. He could not say with any certainty that the slip and fall caused her condition.
On cross-examination, this psychiatrist admitted no knowledge of Gibson's numerous stress causing problems with her employer (which predated her alleged slip and fall) or the fact that she had exhibited job adjustment problems unrelated in any way to the alleged slip and fall. Theodore Hawkins, Gibson's supervisor during the short time she had been employed by the school board, testified of prior instances in which Gibson had refused to follow orders and indicated that she clearly was a problem employee before the alleged slip and fall. He related an incident in which she had been denied use of a particular elevator whereupon, as a direct result, she sent an alarm over the school public address system that she had just fallen down the stairs and broken her lega totally untrue statement. A letter dated April 23, 1975 (several weeks prior to her alleged slip and fall) from the director of Custodial Services of the school board had warned Gibson that her employment record was not gooda general prerequisite to discharge for cause.
The above incidents and their chronological significance in the causation of Gibson's alleged disability were called to the attention of Dr. Anastasio, who had based his diagnosis on the "stress" resulting from Gibson's slip and fall:
"EXAMINATION BY MR. KOLTUN:
* * * * * *
A. I had to go on the history (she gave), yes.
Q. Now, stress could have come in several forms, could it not?
A. Yes.

*735 Q. Stress could also be in the form of a letter from her employer threatening to fire her if she did not improve?
A. Yes.
Q. Constant arguing with her supervisor or assistant supervisor, would be described as stress and disability responses to stress?
A. It would show difficulty in getting along with authority figures.
Q. Well, in forms of work, that would disable her from working?
A. It would certainly be a factor. Yes, if she doesn't get along.
* * * * * *
Q. Or for example, a disability response would be whereby Mrs. Gibson had been told to stay away from an elevator and not use an elevator by her supervisor, she goes ahead and calls on an intercom and states I broke my leg, and stating this at all points, calling on the intercom summons people in her employment situation, and then treats that as a joke with a smile on her face, would that not be correct?
A. It would be and I believe an appropriate response. Whether or not it would be a disability, I imagine it would be up to her employer.
Q. It would be a sign of her inability to deal with people in authority, would it not?
A. It would show.
Q. Doctor, as you recall I took your deposition on November 15th, 1976. Now, I'd like for you to turn to Page 33, Line 19 and I will read.`Or if she calls up and states I broke my leg and the supervisor comes up, and once upnow that you are here you can operate the elevator.' That's not the sign of disability, that you are talking about?
A. It's a sign of her inability to deal with people in authority.
Q. Can you consider this disability?
A. Yes, my opinion if it was my employer doing that, I would consider that employer not to be hired, unable enough to work for me.
* * * * * *
Q. Now, it's your opinion that plaintiff is disabled from doing any work or working with supervision?
A. Essentially any work because of the fact that any work she could do requires some type of supervision."
At the time of trial, Dr. Anastasio stated that Gibson's inability to get along with authority figures constituted a disability from performing her job. He had seen her in May and August, but his reports from those interviews did not suggest she was disabled. It was not until October (just prior to trial) that, without again seeing Gibson, he rendered a report indicating that she was "disabled." He admitted his understanding that such a report was a requisite for her recovery in the workmen's compensation trial about to commence.
It is the well established jurisprudence of the state that plaintiff in a workmen's compensation case may recover for disability resulting from a mental condition. Victoriana v. Orleans Parish School Board (La.App. 4th Cir. 1977); Melerine v. Ford Motor Corporation, 239 So.2d 406 (La.App. 4th Cir. 1970). However, in such cases, the court must proceed with utmost caution, particularly where there is an absence of objective symptoms. Victoriana v. Orleans Parish School Board, supra; Sanderson v. Employers Liability Assurance Corporation, supra. It is the responsibility of the trial judge to evaluate all the testimony, both lay and medical, and the duty of the trial judge to reject testimony which is lacking in credibility. Jennings v. Halliburton Company, 346 So.2d 268 (La.App. 4th Cir. 1977). Furthermore, where it has been demonstrated that the psychiatrist has relied entirely on an incomplete or inaccurate history, his conclusion as to the cause of the alleged condition may be completely disregarded. Jennings, supra; Smith v. Wiley Wood Construction Co., 247 So.2d 904 (La.App. 4th Cir. 1971); Melerine, supra. The *736 applicability of this rule in the case at bar is further warranted by the inconclusiveness of the psychiatrist's testimony.
While we also disagree strongly with the trial court's findings of physical disability beyond the initial two-week period and believe that he was in error in reaching such a conclusion, we are not able, in this respect, to categorize that error as manifest, demanding reversal. By considering the record in a context most favorable to Gibson (in view of the trial court's judgment), we do find minimal support for the contention that Gibson could not fully perform all of the duties of her jobas a result of the alleged slip and falluntil she was certified as able to return to work by Dr. Kroll in April of 1976.
In this connection, we must also address the erroneous ruling of the trial court that Gibson is entitled to have her disability payments based on a six day work week. This ruling was incorrectly grounded on La.R.S. 23:1021(11) (1950), as it existed prior to its amendment in 1968. It read:
"(11) `Wages' means the daily rate of pay at which the service rendered by the injured employee is recompensed under the contract of hiring in force at the time of the injury."
Jurisprudence interpreting this statute required the use of a six day work week in calculating the weekly wage of an employee who worked five days per week for forty hours each week. See, e. g., McPhearson v. Hunt Lumber Co., 158 So.2d 430 (La.App. 3rd Cir. 1968).
By Acts 1968, Ex.Sess. No. 25, Sec. 1, this section of the act, now codified as La.R.S. 23:1021(7), was amended to read:
"(7) `Wages' means average weekly wage at time of the accident. The average weekly wage shall be determined as follows: (a) If the employee is paid on an hourly basis, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the injury or forty hours, whichever is greater . . .."
It is this amended statute which should have been applied by the trial court. Sixtyfive percent of plaintiff's average weekly wage of $2.10 per hour for forty hours is $54.60 per week.
Accordingly, the judgment of the Civil District Court for the Parish of Orleans is amended and recast, and it is now ordered, adjudged and decreed that there be judgment herein in favor of Shirley Gibson and against Orleans Parish School Board, awarding said Shirley Gibson compensation payments at the rate of $54.60 per week from July 16, 1975 to May 15, 1976, with legal interest on each past-due installment from its due date until paid, subject to a credit of $130.00. It is further ordered, adjudged and decreed that there be judgment herein against Orleans Parish School Board and in favor of Shirley Gibson for those specific and particularized medical expenses incurred and paid by said Shirley Gibson as a result of her examination and treatment by Dr. Vernon Kroll and Dr. Ray Haddad. It is further ordered, adjudged and decreed that the expert fees of Drs. Axelrod, Kroll and Faust be taxed as costs and that costs in the trial court proceeding shall be borne by Orleans Parish School Board. Each party is to bear their own costs of appeal.
As amended and recast, the judgment is affirmed.
AMENDED, RECAST AND, AS AMENDED, AFFIRMED.

ON APPLICATIONS FOR REHEARING
PER CURIAM.
Though we deny both applications for rehearing, we correct our original opinion to provide that the Orleans Parish School Board shall be cast only for those costs which are not exempted by the application of La.R.S. 13:4521. The board, nevertheless, must bear its own expert witness fees. (Specifically, plaintiff must pay her experts and the school board must pay its experts.)
APPLICATIONS FOR REHEARING DENIED.